**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

**ANGELA L. MULBERRY,**

     **Plaintiff,**

**vs.**                           **Case No.  1:13-CV-94-SPM/CAS**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

     **Defendant.**

_____/

## REPORT AND RECOMMENDATION

     This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's application Supplemental Security Income (SSI).  After careful consideration of the entire Record, it is recommended that the decision of the Commissioner be affirmed.

## I.  Procedural History

     On November 3, 2008, Plaintiff, Angela L. Mulberry, filed a Title XVI application for SSI alleging disability beginning August 1, 2007, due to mental illness, bipolar, depression, and mood swings.  R. 18, 122, 136.  (Citations to the Record shall be by the symbol ("R.") followed by a page number that appears in the lower right corner.)

Plaintiff's application was denied initially on March 12, 2009, and upon reconsideration on September 10, 2009. R. 18, 43-50. On October 15, 2009, Plaintiff requested a hearing. R. 18, 57. On June 9, 2011, a hearing was conducted in Jacksonville, Florida, by Administrative Law Judge (ALJ) Patrick F. McLaughlin. R. 27, 49-95. Plaintiff was represented by Pamela C. Dunmore, an attorney. R. 18, 34, 55. A. Mark Capps, an impartial vocational expert, testified during the hearing. R. 18, 34-37. Plaintiff did not attend the hearing and, at the request of Ms. Dunmore, the ALJ declared her to be a non-essential witness and proceeded to hearing without her. R. 22, 34. (The ALJ took "an adverse inference" from Plaintiff's lack of attendance at the hearing. R. 24.)

On June 21, 2011, the ALJ issued a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled from November 13, 2008, through the date of the ALJ's decision. R. 18-27. On or about August 17, 2011, Plaintiff requested review of the ALJ's decision. R. 13-14. On March 22, 2013, the Appeals Council considered and denied Plaintiff's request for review of the ALJ's decision. R. 1-4. The ALJ's decision stands as the final decision of the Commissioner.

On May 21, 2013, Plaintiff filed a Complaint with the United States District Court seeking review of the ALJ's decision. Doc. 1. The parties filed memoranda of law, docs. 11 and 12, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal:

1. "The claimant has not engaged in substantial gainful activity since November 13, 2008, the application date." R. 20.

2. "The claimant has the following severe impairments: post-traumatic stress disorder (PTSD), depressive disorder with psychotic features, and substance abuse." *Id*.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id*. The ALJ determined, in part, that Plaintiff had *mild* restriction in activities of daily living and social functioning; *marked* difficulties with regard to concentration, persistence or pace; and *no* episodes of decompensation, which have been of extended duration, although the ALJ noted that Plaintiff had been voluntarily hospitalized for mental impairments and "were not of extended duration" and that Plaintiff "responded well to treatment while hospitalized." R. 20-21.

4. "[T]he claimant has the residual functional capacity [RFC] to perform a full range of work at all exertional levels but with nonexertional limitations. Specifically, the claimant is limited to simple, routine tasks requiring only occasional contact with the public and co-workers. Lastly, the claimant requires assistance in goal setting." R. 22. Under this section of the decision, the ALJ considers the material evidence including the treatment notes of Diana Santiago, M.D., Plaintiff's treating psychiatrist. R. 24-25.

5. "The claimant has no past relevant work." R. 26.

6. "The claimant was born on November 22, 1968[,] and was 39 years old, which is defined as a younger individual age 18-49, on the date the application was filed." *Id*.

7. "The claimant has a limited education and is able to communicate in English." *Id*.

8. "Considering the claimant's age, education, work experience, and [RFC], there are jobs in significant numbers in the national economy that the claimant can perform." *Id*. These unskilled jobs include cleaner II (SVP of 1, medium exertional level; order picker (SVP of 2, medium exertional level); and assembler (small products) (SVP of 2, light exertional level. R. 26-27; *see supra* n.3. The ALJ considered, in part, the testimony of the vocational expert. R. 27.

9. "The claimant has not been under a disability, as defined in the Social Security Act, since November 13, 2008, the date the application was filed." R. 31.

## III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles. 42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted). The court may not reweigh the evidence or substitute its own judgment for that of the ALJ even if it finds that the evidence preponderates against the ALJ's decision. Moore, 405 F.3d at 1211.[1]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

---

[1] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 404.1509, 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps. 20 C.F.R. § 416.920(a)(4)(i)-(v).

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.     Does the individual have any impairments which prevent past relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work.

If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416. 920(a)(4)(v), (e) & (g). If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

As the finder of fact, the ALJ is charged with the duty to evaluate all of the medical opinions of the record resolving conflicts that might appear. 20 C.F.R. § 416.927. When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 416.927(b) & (c).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians

"are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003). "'The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records.' *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added)." *Id*.

> As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit that [sic] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, [538 U.S. 822, 832 (2003)]. Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.
>
> A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 373, 374 (10th Cir. 1995) (emphasis added).

Doyal, 331 F.3d at 762-63.

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must

specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." <u>MacGregor,</u> 786 F.2d at 1053.

The ALJ may discount a treating physician's opinion report regarding an inability to work if it is unsupported by objective medical evidence and is wholly conclusory. <u>Edwards v. Sullivan</u>, 937 F.2d 580, 583-84 (11th Cir. 1991). Stated somewhat differently, the ALJ may discount the treating physician's opinion if good cause exists to do so. <u>Hillsman v. Bowen</u>, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." <u>Lewis</u>, 125 F.3d at 1440; <u>Edward</u>, 937 F.2d at 583 (citing <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987)). Further, where a treating physician has merely made conclusory statements, the ALJ may afford them such weight to the extent they are supported by clinical or laboratory findings and are consistent with other evidence as to a claimant's impairments. <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986).

## IV. The Evidence

### A. Medical Evidence

Plaintiff alleged that her disability began on August 1, 2007. R. 18, 137. This is the date she stopped working. *Id.* The medical record does not appear to contain evidence of medical treatment from that date until early 2008.

On March 18, 2008, Plaintiff voluntarily sought admission to Meridian Behavioral Healthcare (Meridian) for a relapse of cocaine use and suicidal ideation.  R. 230-35; 312-22; *see* R. 22.  Medical records indicate she had been non-compliant with her treatment and had not taken medication for two days.  R. 231, 318.  During her stay, Plaintiff was treated with counseling and medication.  R. 221-24.  A patient note indicates Plaintiff first used cocaine at age 35 and marijuana at age 7.  R. 318.  On March 22, 2008, Plaintiff was discharged in stable condition, denied suicidal ideations and hallucinations, was compliant with treatment and medicine, and received a <u>Global Assessment of Functioning</u> (GAF) score of 55 (23 and 35 on admission, R. 229, 235), indicating only moderate symptoms.  R. 221–22, 227.[2]  Her discharge diagnoses were

---

[2]  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF Scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id.  See* <u>Nichols v. Astrue</u>, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).  A score of 21-30 is defined as behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. *Id.*  A score of 31-40 is defined as manifesting "[s]ome impairment in realty testing or communication (e.g., speech is at times illogical, obscure, or irrelevant)" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Id.*  A GAF scale rating of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" <u>Wind v. Barnhart</u>, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th Ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable

depression, NOS, PTSD, and poly-substance abuse.  R. 222, 22, 314.  Plaintiff was

prescribed Prozac and Abilify.  R. 227, 314.  Plaintiff continued to receive outpatient

mental health treatment at Meridian 2008 2009.

Treatment notes from June of 2008 show that her appearance was good, her

manner was appropriate, her mood was "ok," except for restless feeling, and she no

longer experienced visual hallucinations.  R. 247; *see* R. 23.  In August 2008, her mood

was anxious, but she reported no adverse effects from medication, her manner was

appropriate, her judgment was fair and insight limited, and she denied suicidal ideation.

R. 245.  In October of 2008, her appearance was good, her manner was appropriate,

her speech was normal and cognition was grossly intact.  R. 243.  Her mood was

"frustrated" and affect "anxious depressed."  Plaintiff reported depression in May of

2009, R. 278, but by June of 2009, her judgment and mood were "fair."  Her insight was

intact.  R. 275–78.  Also in June 2009, Plaintiff reported that she had to have "disability

papers" signed, but Dr. Bhandari, who treated her at that visit, informed her that she

would need to undergo an evaluation for work-related disability.  R. 276.

Plaintiff sought voluntary hospitalization on or about August 29, 2010, for

increased depression and suicidal ideation.  R. 300-02, 307; *see* R. 23.  Wei Peng,

Ed.S., the clinician who evaluated Plaintiff, noted that she had been out of medication

for two months.  R. 304, 307, 309.  Plaintiff's GAF score was 23.  R. 310.  A screening

evaluation showed alcohol, marijuana, and cocaine use.  R. 307-08.  After a one-week

stay and an adjustment in medication, Plaintiff's mood improved significantly and her

suicidal ideation became less severe.  R. 302.  She was discharged on September 6,

psychometrics in routine practice.  In order to provide a global measure of disability, the
WHO Disability Assessment Schedule (WHODAS) is included, for further study, in
Section III of DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16.

2010, with a diagnosis of major depressive disorder, severe and her GAF score was 45.
*Id.*

Plaintiff returned to Meridian in January 2011 to begin out-patient treatment.
R. 343-49; *see* R. 23. Diana Santiago, M.D., a psychiatrist, diagnosed Plaintiff with a
mood disorder and cocaine, marijuana, and alcohol abuse. R. 346; *see* R. 24-25. She
assigned Plaintiff a GAF score of 45 and advised her to return in one month. R. 341,
346. Plaintiff returned for treatment on February 4, 2011, when Dr. Santiago noted that
her appearance was fair, her manner was appropriate, speech was normal, and her
cognition was grossly intact. Insight and judgment were fair. Plaintiff denied suicidal
ideation and hallucinations. Her progress was rated at "6" on and "10" point scale.
Dr. Santiago's diagnoses were mood disorder, NOS, and poly-substance abuse.
R. 339-40; *see* R. 337-38 (March 2011 visit).

On February 16, 2011, Dr. Santiago completed a mental RFC assessment form
to assess Plaintiff's work-related mental functioning for Plaintiff's disability claim.
R. 332-34. Plaintiff provided no notes on this form. *Id.* Dr. Santiago rated Plaintiff with
*mild* ("understanding and memory" category) in her ability to remember locations and
work-like procedures, the only mild rating provided in any category. R. 332. In the
same category, Plaintiff was rated as *moderate* in her ability to understand and
remember very short and simple instructions and *marked* in her ability to understand
and remember detailed instructions. *Id.*

Under the category of "sustained concentration and persistence," Plaintiff was
rated *moderate* in her ability to carry out very short and simple instructions; her ability to
perform activities within a schedule, maintain regular attendance and be punctual within

customary tolerances; ability to work in coordination with or proximity to others without being distracted by them; and her ability to make simple work-related decisions.  R. 333. Dr. Santiago assessed Plaintiff with *marked* limitations regarding her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; and her ability to sustain ordinary routine without special supervision.  R. 332-33.  Dr. Santiago rated Plaintiff *extreme* regarding her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. R. 333.

Under the category "social interaction," Dr. Santiago rated Plaintiff as *moderate* in her ability to interact with the general public and ability to ask simple questions or request assistance, and in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  R. 333-34.  Plaintiff was rated *marked* in her ability to accept instructions and respond appropriately to criticism from supervisors and ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  R. 333.

Under the category "adaptation," Dr. Santiago rated Plaintiff as *moderate* in her ability to be aware of normal hazards and take appropriate precautions and ability to travel in unfamiliar places and use public transportation.  R. 334.  Plaintiff was rated as *marked* in her ability to respond appropriately to changes in the work setting and ability to set realistic goals or make plans independently of others.  *Id*.

When Plaintiff returned to Dr. Santiago in March of 2011, Dr. Santiago again noted that Plaintiff's mood was "fine" and affect was "euthymic," her appearance was

fair, her manner was appropriate, her speech was normal, her insight and judgment were "fair," her thought process was "linear," and her cognition was grossly intact. R. 337-38. Plaintiff was to re-start her medications that included Trazodone, Prozac, and Abilify. R. 338. In April of 2011, Plaintiff's appearance was appropriate, mood was the same (fine), thought process was organized, she denied suicidal ideation or hallucinations, and her insight and judgment were limited. R. 335-36. Plaintiff was encouraged to start her medications and it was noted Plaintiff "has prescriptions." Plaintiff had a urine test and admitted she was using marijuana. R. 336.

The ALJ summarized Dr. Santiago's treatment notes and evaluation.

The undersigned notes the February 16, 2011, assessment of the claimant by Diana Santiago, M.D. According to Dr. Santiago, the claimant has extreme limitations in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Santiago also concluded the claimant has marked, moderate, and mild limitations in a variety of other work-related areas (Exhibit 13F).

The undersigned notes that if a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The undersigned concludes in the present case, however, that the opinion [sic] Dr. Santiago's opinion is not well supported by medically acceptable techniques and is inconsistent with the other substantial evidence in the record. For example, Dr. Santiago's treatment notes do not support the conclusion the claimant is as severely impaired as provided for in the assessment. On April 15, 2011, Dr. Santiago notes the claimant's mood was appropriate, her motor behavior and speech normal, her cognition grossly intact, and her appearance fair. Dr. Santiago also described her thought process as organized. Further, Dr. Santiago also noted the claimant was not taking her prescribed medication. On March 16, 2011, Dr. Santiago described the claimant's mood as euthymic, her thought process as linear, her speech and motor behavior as normal, her insight and judgment as fair, and her manner as appropriate. On February 4, 2011, Dr. Santiago described the claimant's mood as appropriate, her motor behavior and speech as normal, her thought process as linear, her insight and judgment as fair, and her progress a "6" out of "10" (Exhibit 14F).

Given this, when a treating physician's opinion does not warrant controlling weight, the ALJ must weigh the opinion based on additional factors. Amongst those are the length of the treatment relationship and frequency of examination, the medical evidence supporting the opinion, consistency with the record as a whole, and other factors that tend to support or contradict the opinion, 20 C.F.R. § 404.1527(d). The undersigned concludes these factors weigh against assigning Dr. Santiago's opinion significant weight. The claimant did not have a long treating relationship with Dr. Santiago and, as noted above, Dr. Santiago's records do not support his [sic] conclusions. In addition, the record as a whole does not support such severe limitations. For example, the claimant's treatment was relatively conservative and consisted primarily of infrequent outpatient counseling and medication. As concluded above, to the claimant's hospitalizations, the undersigned notes they were voluntary in nature, indicating she retained the ability to understand when she needed appropriate treatment and retained the ability to seek it out. As also noted above, those episodes occurred after the claimant abused illegal substances. Given that, their infrequency, and quick response to treatment, the claimant's hospitalizations are not indicative of limitations as severe as those in Dr. Santiago's assessment of the claimant.

R. 24-25.

## B. Consultative Evaluations and Examinations

On May 2, 2011, William E. Benet, Ph.D., Psy.D., a clinical psychologist, performed a consultative psychological evaluation. R. 324-31; *see* R. 23-24. Plaintiff was responsive and cooperative. R. 324. Plaintiff reported that she used marijuana on an ongoing basis, most recently three to four days earlier. R. 325. She reported that in the past she had used "a lot" of crack cocaine, but not much in the past year. *Id.* No physical health problems were reported. R. 325. She left high school in the eleventh grade and did not graduate and has not obtained a GED diploma. R. 326. Plaintiff was unemployed and "fired from her last job at a deli after two months because she could not remember what to do. She reported that all of her jobs have involved fast food work and none lasted longer than three months. She reported that she has had about seven jobs altogether." *Id.*

Plaintiff reported that she had enjoyed doing many things, including swimming, playing basketball, and shooting pool, all of which she had last engaged in one year earlier during a trip to Crescent Beach.  R. 326; *see* R. 23.  Currently, she performed some household chores, but otherwise spends most of her day in bed.  *Id.*

A mental status examination showed that Plaintiff was sad and depressed, but her thinking was organized and goal-directed, her attention and concentration were adequate, and her general intellectual ability and verbal reasoning were average.  Her judgment and insight were questionable.  *Id.*  Her score on the Minnesota Multiphasic Personality Inventory-2 suggested a likely invalid profile and one associated with paranoid schizophrenia.  R. 327; *see* R. 23.  Her cognitive functioning was intact, however, with no impairment in reasoning or memory functioning.  *Id.*  Dr. Benet concluded that Plaintiff should be able to perform work-related tasks involving understanding and memory, but would likely have marked difficulty performing tasks involving sustained concentration and persistence, social interaction, and adaptation. *Id.*  He expected Plaintiff to improve with continued psychiatric treatment for mood disorder and sustained sobriety.  *Id.*  He diagnosed Plaintiff with a mood disorder, NOS, with psychotic features, PTSD, poly-substance dependence, and a GAF score of 40-45. The prognosis was guarded.  *Id.*  Dr. Benet recommended continued psychiatric treatment of the mood disorder, PTSD, and antisocial personality with psychological counseling and complete cessation of marijuana, crack cocaine, and alcohol.  R. 328; *see* R. 24.

In an assessment of work-related mental functioning, Dr. Benet concluded that Plaintiff would have *marked* limitations in her ability to make judgments on complex

work-related decisions and respond appropriately to usual work situations and changes

in a routine work setting, but that significant improvement may be expected to sustain

sobriety and cessation of drug use. No extreme ratings are provided. Plaintiff had no

limitations in her ability to understand and remember simple instruction, carry out simple

instructions, and in her ability to make judgments on simple work-related decisions.

Plaintiff was rated as *mild* in her ability to interact appropriately with the public and

*moderate* in her ability to understand and remember complex instructions and carry out

complex instructions and to interact appropriately with supervisor(s) and co-workers.

R. 329-30.

On March 6, 2009, Alan Harris, Ph.D., completed a mental RFC assessment,

R. 252-55, and a Psychiatric Review Technique (PRT). R. 256-69; *see* R. 23. In the

former, Dr. Harris concluded that Plaintiff had *no* significant limitations in her abilities

with respect to understanding and memory, her ability to carry out short instructions,

sustain ordinary routine, make simple work-related decisions, interact with the general

public, asked simple questions, maintain socially appropriate behavior, be aware of

normal hazards, or travel in unfamiliar places. R. 252-53. He further determined that

Plaintiff had *moderate* limitations in her ability to carry out detailed instructions, and

maintain attention and concentration for extended periods, work with others, complete a

normal work day, accept instructions, get along with her-workers, respond to changes at

work, and set realistic goals. *Id.* Dr. Harris concluded that Plaintiff was overwhelmed

by change and would need assistance with effective goal-setting and planning. R. 254.

In the PRT, Dr. Harris determined that Plaintiff had *moderate* difficulties in maintaining

social functioning and maintaining concentration, persistence, or pace, mild limitations

of daily activities, and *no* episodes of decompensation, each of extended duration.

R. 266; *see* R. 268 (consultant's notes).

On September 8, 2009, Theodore Weber, M.Div., Psy.D., performed a mental

RFC assessment. R. 293-95; *see* R. 23. He determined that Plaintiff had *moderate*

limitations in areas of work-related mental functioning, including the ability to understand

and remember detailed instructions, ability to carry out detailed instructions, ability to

maintain attention and concentration for extended periods, ability to complete a normal

workday and workweek without interruptions, ability to accept instructions and respond

appropriately to criticism from supervisors, ability to get along with coworkers or peers

without distracting them or exhibiting behavioral extremes, and ability to set realistic

goals or make plans independently of others. R. 293-94. Plaintiff was not significantly

limited in all other areas. *Id.* Dr. Weber elaborated on his assessment in his "functional

capacity assessment" notes. R. 295. Among other statements, Dr. Weber stated:

"Overall, capable of completing simple tasks on a regular basis from a mental

standpoint. The TP made strong statements on 1/09 that the cl cannot work but follow

up appointments show improvement. The cl would likely be able to function if she stays

in treatment and avoids substances. She would likely function better in an environment

where she does not have to relate to many people." *Id.*

Dr. Weber also completed a PRT. R. 279-92. Dr. Weber noted that Plaintiff lived

with her boyfriend and was able to care for her personal hygiene without direction from

others; she was able to prepare simple meals, clean, wash laundry and iron; she

needed assistance and encouragement to complete tasks; and she socialized with her

family and did not have difficulty getting along with others, although she did not like

crowds.  R. 291.

### C.  Testimony from the Vocational Expert

A. Mark Capps testified without objection as a vocational expert.  R. 34-37.

The ALJ asked Mr. Capps to consider individual with Plaintiff's vocational profile, who

was capable of working all exertional levels that involved only simple, routine tasks;

occasional contact with the public and cold-worker; and provided assistance with goal

setting.  R. 35.  Mr. Capps testified that such an individual could perform the

representative unskilled jobs of cleaner, order picker, and assembler of small products,

all of which existed in significant numbers in the national economy.  R. 36.[3]

## V. Legal Analysis

Plaintiff argues that the ALJ erred when he rejected the opinion of treating

physician/psychiatrist, Dr. Santiago, who assessed Plaintiff with marked and extreme

limitations in some areas of work-related mental functioning.  Doc. 11 at 7-16.

In determining Plaintiff's RFC for a modified range of simple, unskilled work, the

ALJ evaluated Dr. Santiago's opinion in accordance with the regulations and extant

case law.  The ALJ considered Dr. Santiago a treating physician.  R. 25.  The ALJ

determined, however, that Dr. Santiago's February 2011 opinion, R.332-34, was not

entitled to controlling weight because it was not well-supported by medically acceptable

techniques and not consistent with other substantial evidence in the record.  R. 25.

---

[3]  "Unskilled work is work which needs little or no judgment to do simple duties
that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).  An
SVP of 1 means a "[s]hort demonstration only."  <u>Dictionary of Occupational Titles</u> (DOT)
(4th Ed., Rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An
SVP of 2 means "[a]nything beyond short demonstration up to and including 1 month."
*Id.*

The ALJ explained that Dr. Santiago's treatment notes did not support her opinion that Plaintiff was not as severely impaired as she opined in her February 2011 Assessment. R. 25. For example, Dr. Santiago saw Plaintiff on two occasions, January 7, 2011, and February 4, 2011, before she rendered her opinion. Although Plaintiff was not doing well when she began treatment in January 2011, by her first return visit on February 4, 2011, Dr. Santiago noted that Plaintiff's mood was fine, her appearance was fair, her manner was appropriate, her speech was normal, and her cognition was grossly intact. R. 339-40. This note is inconsistent with Dr. Santiago's opinion that Plaintiff had marked and extreme limitations.

Dr. Santiago's subsequent treatment notes, from March and April 2011, provide similar observations and do not support Dr. Santiago's opinions. R. 335-38. Further, Dr. Santiago's opinions are inconsistent with other substantial evidence in the record, including Dr. Benet's opinion that Plaintiff had work-related mental abilities with the ability to perform simple, unskilled work, R. 329-31, and the opinions of Drs. Harris and Weber that Plaintiff remained able to perform mental tasks consistent with unskilled work. R. 252-54, 293-96.

The ALJ weighed Dr. Santiago's opinions in accordance with other factors under the regulations, but determined that those factors weighed against assigning Dr. Santiago's opinions significant weight. R. 25. For example, the ALJ indicated that although the opinion of a physician with a long treating relationship is given greater weight, Plaintiff did not have a long treating relationship with Dr. Santiago, but saw her on four occasions. R. 24-25. The ALJ also found that Plaintiff's "treatment was

relatively conservative and consisted primarily of infrequent out-patient counseling and medication." R. 25.

Plaintiff also suggests that her hospitalizations support her allegation of disability. The ALJ, however, noted that Plaintiff's hospitalizations "were voluntary in nature, indicating she retained the ability to understand when she needed appropriate treatment and retained the ability to seek it out." As further stated by the ALJ, the "episodes occurred after the claimant abused illegal substances [March 2008]. Given that, their infrequency, and quick response to treatment, the claimant's hospitalizations are not indicative of limitations as severe as those in Dr. Santiago's assessment of the claimant." R. 25, 230-35, 300-09. (An episode also occurred when Plaintiff was not using her medication in August of 2010. *Id.*) As a result, Plaintiff's condition during the voluntary hospitalizations did not represent her level of functioning when she was stable and undergoing treatment and taking her medication, as she was in 2008 and 2009. R. 243-47, 275-78. Substantial evidence supports the ALJ's consideration of Dr. Santiago's February 2011 opinions.

The ALJ determined that notwithstanding Plaintiff's depression, PTSD, and substance abuse, Plaintiff remained able to perform unskilled work that involved simple, routine, repetitive tasks, occasional contact with the public and co-workers, and assistance in goal-setting. R. 22. The ALJ's RFC assessment is supported by Plaintiff's ability to perform simple household tasks such as cleaning, cooking, and laundry. Drs. Harris and Weber opined that Plaintiff had no significant limitations in understanding and memory or in sustained concentration and persistence with respect to simple tasks. R. 252-53, 293-95. The ALJ's determination is also supported by

Dr. Benet's opinion that Plaintiff's attention and concentration were adequate, her cognitive functioning was intact, she had no impairment in reasoning or memory functioning, and she should be able to perform work-related mental tasks involving understanding and memory, R. 324-26; as well as treatment notes from Meridian demonstrating that Plaintiff had intact cognition.  R. 335-40.

The ALJ accounted for Plaintiff's assertion that she experienced difficulty interacting with the public, R. 136, by limiting Plaintiff to work that required only occasional contact with the public and co-workers.  R. 22.

The medical evidence indicates that Plaintiff's mental impairments improved in the absence of substance abuse and that she became stable on medication. Substantial evidence supports the ALJ's RFC assessment that Plaintiff remained able to perform a modified range of unskilled work and that Plaintiff could perform a number of jobs in the national economy, the latter finding supported by the testimony of the vocational expert.  R. 26-27, 35-36.

## VI. Conclusion

Considering the Record as a whole, the findings of the ALJ are based upon substantial evidence in the record and the ALJ correctly applied the law.  Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED.**

**IN CHAMBERS** at Tallahassee, Florida, on December 20, 2013.


**s/ Charles A. Stampelos_____**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**